Littleton, Judge,
delivered the opinion of the court:
This case comes before the court pursuant to House Resolution 135, 82d Congress, 1st session, which reads as follows:
Resolved, That the bill (H. R. 2211) entitled “A bill for the relief of Mrs. Rosaria Cusimano”, now pending in the House of Representatives, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with *353 the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
The plaintiff seeks to recover from the defendant the value of a home that she owned in Lincoln, Nebraska, but which was lost as a result of mortgage foreclosure proceedings brought by the Metropolitan Life Insurance Company, which foreclosure was confirmed by the court August 9, 1935. Plaintiff alleges that her home was lost because the Home Owners’ Loan Corporation, hereinafter referred to as HOLC, willfully failed and refused to fulfill its agreement to refinance plaintiff’s mortgage on the house. The mortgage was at all times held by the Metropolitan Life Insurance Company, hereinafter referred to as Metropolitan.
In June 1932, because the plaintiff had failed to make timely payments on her mortgage, the Metropolitan determined to institute foreclosure proceedings against the property. This was done and a foreclosure decree was entered August 4, 1933, for the indebtedness due by plaintiff of $3,780.69 plus interest. Finding 4. However, plaintiff remained in possession, and before the foreclosure proceedings were completed the State of Nebraska granted a moratorium in all foreclosure actions.[1] Under this statute the plaintiff continued to retain possession of her home by paying “moratorium rents” during the period of the stay in the foreclosure proceedings.
On June 13,1933, the Home Owners’ Loan Act of 1933 (48 Stat. 128,130), was approved. Pursuant to this statute the HOLC was organized. The statute provided, Section 4 (d), in part, as follows:
(d) The Corporation is authorized * * * (1) to acquire in exchange for bonds issued by it, home mortgages and other obligations and liens secured by real estate * * * and (2) in connection with any such ex *354 change, to make advances in cash to pay the tases and assessments on the real estate, to provide for necessary maintenance and to make necessary repairs, to meet the incidental expenses of the transaction, and to pay such amounts, not exceeding $50, to the holder of the mortgage, obligation, or lien acquired as may be the difference between the face value of the bonds exchanged plus accrued interest thereon and the purchase price of the mortgage, obligation, or lien. The face value of the bonds so exchanged plus accrued interest thereon and the cash so advanced shall not exceed in any case $14,000, or 80 per centum of the value of the real estate as determined by an appraisal made by the Corporation, .whichever is the smaller. In any case in which the amount of the face value of the bonds exchanged plus accrued interest thereon and the cash advanced is less than the amount the home owner owes with respect to the home mortgage or other obligation or lien so acquired by the Corporation, the Corporation Shall credit the difference between such amounts to the home owner and shall reduce the amount owed by the home owner bo the Corporation to that extent. Each home mortgage or other obligation or lien so acquired shall be carried as a first lien or refinanced as a home mortgage by the Corporation on the basis of the price paid therefor by the Corporation, and shall be amortized by means of monthly payments sufficient to retire the interest and principal within a period of not to exceed fifteen years; * * *
On April 4, 1934, at which time plaintiff was indebted to Metropolitan in the amount of $4,124, she made application to the local HOLC office in Lincoln, Nebraska for a loan on her property. Soon thereafter the plaintiff received a letter from the local HOLC office advising her that her application was in order and that she was eligible for a loan. Upon meeting with officials of the local HOLC office she was informed that it would be necessary for her to have her house painted. She stated that she would have thstt done at her expense, but although she solicited and received several bids from contractors, the work was never undertaken.
Under the Home Owners’ Loan Act of 1933, and the regulations thereunder, all applications of home owners for loans and consents to the transfer of mortgages from mortgagees to the HOLC were prepared by local offices of the HOLC, but such applications and consents had to be approved by the *355 State Director of the HOLC before a loan could be made. Plaintiff knew this.
Approximately 10 days after this first conference the plaintiff once again met with the officials of the local HOLC and was informed that Metropolitan had agreed to accept bonds from HOLC in the amount of $3,165.79, in exchange for the mortgage on the plaintiff’s property, provided the plaintiff paid directly to Metropolitan the sum of $380.21. Section 4 (d), supra, of the Act of June 13,1933, provided that “The face value of the bonds so exchanged plus accrued interest thereon and the cash so advanced shall not exceed in any case $14,000, or 80 per centum of the value of the real estate as determined by an appraisal made by the Corporation, whichever is the smaller.”
Having first determined that she could raise $380.21, above mentioned, by borrowing on various insurance policies, the plaintiff informed the HOLC that those terms were acceptable to her. Upon obtaining the money the plaintiff met again with these HOLC officials, at which time the $380.21 was given to Metropolitan’s representative, and this representative and the plaintiff signed a consent whereby the parties agreed to the transfer of the mortgage on plaintiff’s property from Metropolitan to HOLC. The plaintiff was given a copy of the consent and was informed that the transaction would not be complete until the Director of the Home Owners’ Loan Corporation for the State of Nebraska had approved the transaction and application and had signed the consent on behalf of the HOLC.
Later that same day after having read over the consent which she had signed, the plaintiff concluded that the payment of the $380.21, which she had been asked to pay the Metropolitan had been illegally demanded of her by the local HOLC officials and Metropolitan and that she had been defrauded by the HOLC in paying it. She arrived at this conclusion because of the language of the agreement to the effect that Metropolitan had agreed to accept the HOLC bonds in full payment of the balance of the loan, which she interpreted to mean the full amount of her indebtedness plus interest to Metropolitan. On the basis of this conclusion the plaintiff, without first conferring further about this matter *356 with officials of the local HOLC office or with the HOLC Director for the State of Nebraska, proceeded at once to accuse the HOLC and Metropolitan representatives of having defrauded her. As a result of this action and conduct of plaintiff the Director of the HOLC for Nebraska did not approve the proposed agreement, with the further result that the agreement among Metropolitan, HOLC, and the plaintiff, was never consummated. See Findings 10, 11, and 12.
Late in 1934 the lending operations of the HOLC were suspended for a period of six months in order to (1) ascertain whether the number of applications on hand, if approved, would exhaust the bond authorization, and (2) enable the field offices of the HOLC to become current on their work of processing pending loan applications.
After making application to the HOLC, as hereinbefore mentioned, the plaintiff had discontinued the payment of the “moratorium rents” to the Nebraska court in which the foreclosure proceeding was pending. This resulted on April 2, 1935, in a foreclosure sale in which the plaintiff’s house was bought in by the Metropolitan. See Findings 13,14 and 15. Shortly thereafter, and some time prior to the time the sale was confirmed by the Nebraska court on August 9, 1935 (Finding 15), the HOLC resumed its lending operations.
On May 24,1935, before the court had confirmed the foreclosure sale, Metropolitan executed and delivered to the HOLC a .new consent and agreed to accept $2,926.41 in exchange for the total mortgage debt and plaintiff was to pay Metropolitan $100 in addition to the $380.21, previously paid to Metropolitan. On this date the plaintiff was indebted to Metropolitan in the amount of $4,760.23. However, the HOLC officials were unsuccessful in their efforts to obtain plaintiff’s signature and agreement to the new consent because she continued to insist that the payment of the $380.21, which she had made in April 1934, had been fraudulently exacted from her. During this period the confirmation of the foreclosure sale by the court was being delayed with the expectation that the plaintiff would obtain the HOLC loan. The plaintiff had brought to the attention of the court her original negotiations with the HOLC. See Finding 14.
*357 On June 25, 1935, Metropolitan wrote the plaintiff as follows:
We refer to the aboye loan for the reason that it is reported to us that you are unwilling to cooperate with the Home Owners’ Loan Corporation, and complete the loan for which you have made application.
We are obliged to advise that unless you will cooperate with the Home Owners’ Loan Corporation, and sign the papers necessary to complete the proposed loan, by July 1, next, it will be necessary to have the attorneys proceed with the foreclosure and obtain possession of the property, security to the loan.
On August 9,1935, after the continued failure and refusal of plaintiff to sign the new consent, the Nebraska court confirmed the foreclosure sale. On that date the appraised valuation of plaintiff’s property was $4,150. On January 18, 1936, Metropolitan returned the $380.21 to the plaintiff.
In late February or early March 1936, Metropolitan obtained a writ of assistance from the court and while the plaintiff was out of the city, on a trip to California, succeeded in taking physical possession of the house. The plaintiff’s furnishings were removed to a storage firm in Lincoln. Upon her return the plaintiff directed that the furnishings be sold, which was done. The proceeds from the sale after deduction for storage costs were given to the plaintiff.
The plaintiff contends that the course of dealings of the HOLC with her amounted to a contract implied in fact to assume the entire mortgage indebtedness on her home and save it from foreclosure. Defendant says, as to this contention, that the conduct of the plaintiff precluded the existence of any contract, express or implied, since there was never at any time a common understanding between the parties which is essential in the creation of any contract. Defendant further contends that even if such a contract did exist the plaintiff is not entitled to recover because she had suffered no damage. This defense is advanced on the premise that the value of the plaintiff’s property at the time of foreclosure was less than her debt to Metropolitan.
The question, therefore, is whether on the facts presented there existed between the parties a contract implied in fact *358 under which the HOLC became obligated to refinance the plaintiff’s mortgage, with the result that its failure to do so was a breach of that contract for which the defendant is liable.
The plaintiff now asserts, in an attempt to justify her actions and course of conduct, that she was unfamiliar with and confused by the negotiations which surrounded her efforts at obtaining the HOLC loan. She alleges that the six-month interruption in the HOLC’s lending operations only served to confuse her further and that as a result of this unfamiliarity and confusion along with the execution of the first consent, she was led to believe that the HOLC would refinance her entire mortgage indebtedness. She asserts “that both the HOLC and plaintiff understood that there was a loan agreement.”
It is impossible upon the evidence presented for the court to agree with the position of the plaintiff.
In order to uphold the plaintiff’s position it would be necessary to find, as the plaintiff urges, (1) that Metropolitan, HOLC, having authority to contract, and plaintiff, entered into an agreement to exchange plaintiff’s mortgage for HOLC bonds for plaintiff’s benefit; and (2) that the HOLC led plaintiff to believe the transaction was complete when the consent was signed, during the preliminary stages of the negotiations with the local HOLC office. Such findings would be contrary to the evidence.
The proof clearly shows that plaintiff was informed and understood at the time the consent agreement was executed with the local HOLC office, in April 1934, that it was not to be binding until approved by the Nebraska Director of HOLC. This approval was clearly essential as condition precedent to the creation of any binding obligation on the part of the HOLC. Darragh v. United States, 33 C. Cls. 337, 391. This approval never materialized because of the plaintiff’s conduct in connection with her conclusion that she had been defrauded in being required to pay the amount of $380.21 in cash, which Metropolitan had requested as part of the consideration in connection with the HOLC loan of $3,165.79, or a total of $3,546 in satisfaction of a mortgagee debt of $4,124.
*359 A contract in order to be implied in fact requires a meeting of the minds. The difference between an express and an implied contract is largely in the character of the proof by which they are established. Lombard v. Rahilly, 149 N. W. 950, (127 Minn. 449); 1 Williston On Contracts (1936 Ed.), Sec. 3. In Baltimore & Ohio R. R. Co. v. United States, 261 U. S. 592, 597, the Court, in affirming a decision of this court (58 C. Cls. 709), stated as follows:
* * * an agreement “implied in fact,” founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of surrounding circumstances, their tacit understanding.
Recognition of the fact that the obligation of the HOLC to refinance was conditioned on approval by the State Director, and that at the time of the negotiation this was known to the plaintiff, eliminates the existence of any “meeting of the minds” or “tacit understanding” between the parties to the effect that a completed transaction had occurred.
There is nothing in the evidence which would lend support to a finding that the HOLC officials led plaintiff to believe that the refinancing arrangements had been completed. Certainly, the subsequent efforts made in good faith by Metropolitan and officials of the HOLC in attempting to secure plaintiff’s agreement and signature to a second consent, and the letter from Metropolitan, did or should have dispelled any belief on the part of the plaintiff that a binding contract had previously been made. The existence of the first consent, which plaintiff had signed, was called to the attention of the Nebraska court having jurisdiction over the foreclosure proceedings, and notwithstanding all that had been done the court confirmed the foreclosure sale. It is not to be presumed that the court acted incorrectly or illegally in approving and finally confirming the foreclosure proceedings. Such a presumption would be required to support a holding here that a binding obligation on the part of HOLC to refinance was in existence at the time such approval by the court was given.
In view of our holding that no implied contract existed, it is not necessary to discuss the defendant’s contention that *360 the plaintiff suffered no damage because her debt to Metropolitan exceeded the value of the property at the time of foreclosure.
The plaintiff is not entitled to recover either in law or equity, and any amount that might be paid plaintiff by Congress on her claim would be a gratuity.
This opinion, the findings of fact, and conclusion of law herein, will be certified to Congress pursuant to House Resolution 135, 82nd Congress, 1st session.
It is so ordered.
Howeel, Judge; Madden, Judge; Whitaker, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court having considered the evidence, the report of Commissioner Marion T. Bennett, and the briefs and arguments of counsel, makes findings of fact as follows:
1. The plaintiff’s claim has been referred to this court by House Resolution 135, 82nd Congress, pursuant to Sections 1492 and 2509 of Title 28, United States Code.
2. The plaintiff was born in Palermo, Italy. She came to this country in 1904 and became a citizen of the United States in 1928. She presently resides at 1833 Morgan Street, Springfield, Ohio. During the period pertinent to this claim she was a resident of Lincoln, Nebraska.
3. In 1926 the plaintiff purchased a home in Lincoln, Nebraska, located at 1010 South 36th Street, from one Ervine L. Bennett, for $6,000. Of this amount, the plaintiff contributed $2,000 in cash and either assumed or obtained a mortgage loan from the Metropolitan Life Insurance Company, hereinafter referred to as Metropolitan, for the remaining $4,000.
4. In June 1932, because of the plaintiff’s failure to make timely payments on her loan, Metropolitan determined to institute foreclosure proceedings against the property. A foreclosure decree was entered on August 4, 1933, in the amount of $3,780.69, plus interest at the rate of 10 percent per annum.
5. Subsequent to the issuance of the foreclosure decree, the plaintiff remained in possession of the property. By the Act *361 of March 2, 1933, Session Laws of the Legislature of the State of Nebraska, 49th Session, 1933, page 301, the State of Nebraska granted a moratorium in all foreclosure actions. The statute also provided for the payment of “moratorium rents” during the period of stay in the foreclosure proceedings. The records presently available do not disclose the amount of rent the plaintiff was to pay or the extent to which she made such payments.
6. On June 13,1933, the Home Owners’ Loan Act of 1933, 48 Stat. 128, 130 was approved. Pursuant to the terms of this statute the Home Owners’ Loan Corporation, hereinafter referred to as the HOLC, was organized. The statute, in part, provided that:
(d) The Corporation is authorized * * * (1) to acquire in exchange for bonds issued by it, home mortgages and other obligations and liens secured by real estate * * * and (2) in connection with any such exchange, to make advances in cash to pay the taxes and assessments on the real estate, to provide for necessary maintenance and make necessary repairs, to meet the incidental expenses of the transaction, and to pay such amounts, not exceeding $50, to the holder of the mortgage, obligation, or lien acquired as may be the difference between the face value of the bonds exchanged plus accrued interest thereon and the purchase price of the mortgage, obligation, or lien. The face value of the bonds so exchanged plus accrued interest thereon and the cash so advanced shall not exceed in any case $14,000, or 80 per centum of the value of the real estate as determined by an appraisal made by the Corporation, whichever is the smaller. In any case in which the amount of the face value of the bonds exchanged plus accrued interest thereon and the cash advanced is less than the amount the home owner owes with respect to the home mortgage or other obligation or lien so acquired by the Corporation, the Corporation shall credit the difference between such amounts to the home owner and shall reduce the amount owed by the home owner to the Corporation to that extent. Each home mortgage or other obligation or lien so acquired shall be carried as a first lien or refinanced as a home mortgage by the Corporation on the basis of the price paid therefor by the Corporation, and shall be amortized by means of monthly payments sufficient to retire the interest and principal within a period of not to exceed fifteen years; * * *
*362 7. Under the terms of this statute the plaintiff, on April 4, 1934, made application at the local office of the HOLC in Lincoln, Nebraska, for a loan on her property. At that time the plaintiff’s indebtedness to Metropolitan amounted to $4,124. Soon after making application, the plaintiff received a letter from the HOLC informing her that her application was .in order and that she was eligible to receive such a loan. At a conference with HOLC officials the plaintiff was informed that it would be necessary that her home be painted. She was asked if she could pay for these repairs and she answered in the affirmative. Thereupon the plaintiff signed a statement to that effect. Subsequently, the plaintiff received several bids from contractors for the painting of the house, but did not have the work performed or enter into any contracts for said work.
8. Approximately 10 days after this first conference the plaintiff received a letter from the HOLC requesting that she come to the HOLC office for a second time. At this meeting the plaintiff was informed by the HOLC representative that Metropolitan had agreed to accept bonds from the HOLC in the amount of $3,165.79 in exchange for the mortgage on the plaintiff’s property provided the plaintiff paid directly to Metropolitan the amount of $380.21.
9. The plaintiff informed the HOLC officials that these terms would be acceptable to her provided she could raise the $380.21. After discussing the matter with her family it was decided that this amount would be borrowed on various life insurance policies maintained by the plaintiff and her family. Upon obtaining the money the plaintiff and her daughter returned to the HOLC office in Lincoln where the $380.21 was given to Metropolitan’s representative and the latter and the plaintiff signed a “consent” whereby the parties agreed to the transfer of the mortgage on the plaintiff’s property from Metropolitan to the HOLC. The plaintiff was given a copy of the consent and was informed that the transaction would not be complete until the HOLC Director for the State of Nebraska approved the transaction and signed the consent on behalf of the HOLC.
10. That evening the plaintiff and her daughter read the consent signed by the plaintiff and Metropolitan. From the *363 language of this document the plaintiff and her daughter concluded that Metropolitan had agreed to accept the HOLC bonds in full payment of the balance of the loan, and that the collateral payment by the plaintiff to Metropolitan of $380.21 was not only illegal, but fraudulent.
11. On the basis of this conclusion the plaintiff and her daughter immediately contacted officials of the HOLC both in Washington and in Nebraska and accused the local HOLC and Metropolitan representatives in Lincoln of obtaining the $380.21 from her by fraud. As a result of the plaintiff’s action, the Director of the HOLC for the State of Nebraska did not sign the consent and approve the agreement on behalf of the HOLC, so the agreement between Metropolitan, the plaintiff and the HOLC was not consummated during the summer or early fall of 1934.
12. In November 1934, lending operations of the HOLC were temporarily suspended for a period of six months for the purpose of (1) ascertaining whether the number of applications on hand, if approved, would exhaust the bond authorization, and (2) enabling the field offices to catch up with their backlogs.
13. After making application to the HOLC, the plaintiff discontinued the payment of moratorium rents to the Nebraska courts. As a result, on April 2,1935, the plaintiff’s property was sold at a foreclosure sale and bought in by Metropolitan. A few weeks later, and prior to the time that the sale was confirmed by the Nebraska court, the HOLC resumed its lending operations. Metropolitan was notified that only $2,926.41 would be available for a loan on the plaintiff’s property. On May 24, 1935, Metropolitan executed a new consent and agreed to accept the $2,926.41 in exchange for the mortgage on the plaintiff’s property provided the plaintiff paid directly to Metropolitan the sum of $480.21. Since Metropolitan had previously collected $380.21 from the plaintiff an additional $100 would have been required. At the time Metropolitan signed this second consent the plaintiff was indebted to Metropolitan in the amount of $4,760.23.
14. Upon receiving the new consent from Metropolitan the HOLC officials attempted, without success, to contact the *364 plaintiff, in order to obtain her signature. The plaintiff retained and continued to assert her belief that the original transaction, as far as the payment of the $380.21 to Metropolitan was concerned, was illegal and fraudulent. Representatives were sent to her home but she refused to admit them. Finally the sheriff’s office called the plaintiff and told her that she was going to be evicted. Thereupon the plaintiff, her daughter and her son went to the judge of the Nebraska court before which the confirmation of the sheriff’s sale to Metropolitan was pending. The plaintiff informed the judge that she had previously signed a consent with Metropolitan and the HOLC and that she expected to obtain a loan from the HOLC on the basis of that agreement. At the time of her visit to the judge he was not acquainted with the circumstances surrounding the plaintiff’s application for an HOLC loan. He told the plaintiff that he would see what he could do. A few days later he called the plaintiff’s home and talked with her daughter, telling her to have her mother go to the local HOLC office and sign the new consent. The plaintiff did not sign the new consent.
15. By the end of June 1935, Metropolitan became concerned over the delays in the completion of the HOLC loan. On June 26, 1935, Metropolitan’s representative in Lincoln wrote the HOLC the following letter:
We refer to the above captioned case for the reason it is our understanding the applicant is still unwilling to cooperate with your department and sign certain papers necessary to complete the proposed loan.
The present mortgage is in foreclosure and sheriff’s sale has been held, and the court delayed confirming the sale as Mrs. Cusimano reported she expected to obtain an HOLC loan.
We feel the Metropolitan Life Insurance Company has been very lenient indeed, but if she is unwilling to cooperate with you, so as to complete the loan, the sheriff’s sale should be confirmed and the Metropolitan given possession of the premises.
We would appreciate it if you would write us a letter which we might show the court when asking for confirmation, so that the court will understand the situation.
*365 On June 25,1935, Metropolitan’s representative in Lincoln wrote tlie plaintiff tbe following letter:
We refer to the above loan for the reason that it is reported to us that you are unwilling to cooperate with the Home Owners’ Loan Corporation, and complete the loan for which you have made application.
We are obliged to advise that unless you will cooperate with the Home Owners’ Loan Corporation, and sign the papers necessary to complete the proposed loan, by July 1, nest, it will be necessary to have the attorneys proceed with the foreclosure and obtain possession of the property, security to the loan.
On August 9,1935, after the continued failure of the plaintiff to sign the new consent, the Nebraska court confirmed the foreclosure sale of the plaintiff’s property to Metropolitan. On that date the appraised valuation of plaintiff’s property was $4,150.
16. On January 18, 1936, Metropolitan refunded the $380.21 to the plaintiff. The latter, in lieu of repaying the loans on the family’s insurance policies, used the money for a trip to California to visit a son who resided there. As a result of this and the default in premium payments, the plaintiff lost the insurance policies on which she had previously borrowed the $380.21.
17. In late February or early March 1936, Metropolitan obtained a writ of assistance from the Nebraska court through the use of which the local sheriff dispossessed the plaintiff and moved her furniture and belongings to the Star Van and Storage Company in Lincoln. The moving costs of $24.40 were paid by Metropolitan. The plaintiff and her family were out of the city at the time. After the removal of the plaintiff’s belongings, Metropolitan had the locks changed on the doors of the house.
Upon her return to Lincoln, the plaintiff attempted, without success, to enter her home. Upon inquiry, she learned where her furniture and belongings were stored. She was informed by the officials of the storage company that she must pay the storage costs on her furniture and belongings or they would be sold. The plaintiff thereupon told the storage company to sell her belongings which they did, re *366 turning a small balance to the plaintiff, after deducting the accrued storage costs.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that the plaintiff is not entitled to recover either in law or equity, and any amount that might be paid plaintiff by Congress on her claim would be a gratuity.

 Act of March 2, 1933, Session Laws of the Legislature of the State of Nebraska, 49th Sess. 1933, p. 301.